This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 85
ACE Securities Corp., &c.,
             Appellant,
         v.
DB Structured Products, Inc.,
             Respondent.

Paul D. Clement, for appellant.
David J. Woll, for respondent.
CXA-13 Corporation; Association of Mortgage Investors;
Association of Financial Guaranty Insurers; National Credit Union
Administration Board; LNR Partners, et al.; Chamber of Commerce
of the United States of America, et al.; Securities Industry and
Financial Markets Association; Mortgage Bankers Association;
Steven L. Schwarcz; Ethan J. Leib, et al.; Federal Home Loan Bank
of Boston, et al., amici curiae.

READ, J.:

This appeal stems from a transaction involving

residential mortgage-backed securities (RMBS). Two

certificateholders in the ACE Securities Corp., Home Equity Loan

Trust, Series 2006-SL2 (the Trust) sued DB Structured Products,

- 1 -

Inc. (DBSP), the sponsor of the transaction, for failure to repurchase loans that allegedly did not conform to DBSP's representations and warranties.  The Trust later sought to substitute itself as plaintiff in place of the certificateholders.  The parties dispute the timeliness of this lawsuit, whether the certificateholders or the Trust complied with a condition precedent and whether the certificateholders possessed standing to sue or, alternatively, the Trust's complaint cured any defect in the certificateholders' standing.  We hold that the Trust's cause of action against DBSP for breach of representations and warranties accrued at the point of contract execution on March 28, 2006.  Where, as in this case, representations and warranties concern the characteristics of their subject as of the date they are made, they are breached, if at all, on that date; DBSP's refusal to repurchase the allegedly defective mortgages did not give rise to a separate cause of action.  Additionally, we hold that, even assuming standing, the two certificateholders did not validly commence this action because they failed to comply with the contractual condition precedent to suit; namely, affording DBSP 60 days to cure and 90 days to repurchase from the date of notice of the alleged non-conforming loans.

I.

In its role as sponsor of the securitization that is at the core of this case, DBSP purchased 8,815 mortgage loans from

at least three third-party mortgage originators.  This pool of loans was sold to an affiliate, ACE Securities Corp. (ACE), a securitization conduit known as a "depositor," pursuant to a Mortgage Loan Purchase Agreement (MLPA) executed between DBSP and ACE.  ACE then transferred the loans and its rights under the MLPA to the Trust, pursuant to a Pooling and Servicing Agreement (PSA).  The parties to the PSA were ACE, as depositor, OCWEN Loan Servicing, LLC (Ocwen), as servicer, Wells Fargo Bank, National Association (Wells Fargo), as master servicer and securities administrator, and HSBC Bank USA, National Association, as trustee (HSBC or the trustee).  DBSP was not a party or signatory to the PSA except for two sections not relevant to this appeal; its role was effectively complete at closing, when it transferred (via ACE) its "rights, title and interest in, to and under the Mortgage Loans" and the "contents of the related Mortgage File" to the trustee and its agents.  The MLPA and PSA were executed on the same day, March 28, 2006.

HSBC acted as trustee for the holders of $500 million in certificates issued by the Trust, and was authorized to bring suit on the Trust's behalf.  The individual mortgage loans served as collateral for the certificates, which paid principal and interest to certificateholders from the cash flow generated by the mortgage loan pool;[1] that is, certificateholders made money

---

[1]As servicer, Ocwen collected the mortgage payments from borrowers and contributed them to the Trust's accounts, and Wells Fargo, the master servicer and securities administrator, oversaw

when the borrowers made payments on their loans.

DBSP made over 50 representations and warranties in the MLPA regarding the credit quality and characteristics of the pooled loans "as of the Closing date," March 28, 2006. The MLPA permitted the Trust to examine each mortgage loan file and exclude from the final pool any loans that did not comply with DBSP's representations and warranties. But the MLPA also relieved the Trust and certificateholders from any obligation to verify DBSP's representations and warranties, or to conduct due diligence on the loan characteristics. Importantly, the Trust's "sole remedy" in the event DBSP "breach[ed] any of the representations and warranties contained in" the MLPA was for DBSP to cure or repurchase a non-conforming loan.

The PSA authorized the trustee to enforce the repurchase obligation in the following way: if HSBC learned of a breach of a representation or warranty, it was required to "promptly notify [DBSP] and the Servicer" of the breach and request that DBSP cure the identified defect or breach within 60 days. If DBSP did not cure the defect or breach in all material respects, the trustee was empowered to "enforce the obligations of [DBSP] under the MLPA to repurchase such Mortgage Loan . . . within ninety (90) days after the date on which [DBSP] was notified of [the breach]." Finally, as relevant here, the PSA

---

Ocwen and was responsible for aggregating and distributing monthly payments and performance reports to certificateholders.

authorized certificate holders entitled to at least 25% of voting rights to enforce certain default events after first requesting in writing that the trustee institute an action and the trustee refused or neglected to do so within 15 days.

A few years after the parties executed the MLPA and PSA, borrower defaults and delinquencies on individual mortgages caused the Trust and certificateholders to lose almost $330 million. Two certificate holders, RMBS Recovery Holdings 4, LLC and VP Structured Products, LLC -- independent investment funds which together held 25% of the voting certificates -- hired a forensic mortgage loan review firm to review a portion of the loans in the trust. Ninety-nine percent of the loans reviewed allegedly failed to comply with at least one of DBSP's representations and warranties in the MLPA about borrowers' incomes, occupancy status or existing debt obligations.

By letter dated January 12, 2012, the two certificateholders gave notice to HSBC of "breaches of representations and warranties in the Mortgage Loans by the Sponsor, [DBSP] under the relevant [PSA] and related trust documents." Citing "the extremely high breach rates found in loan file reviews," the certificateholders "demand[ed] that the Mortgage Loans in the Trust in their entirety be put back to [DBSP] for repurchase, including all of the individual defective loans uncovered [during their] investigation" (emphasis added). Further, the certificateholders alerted the trustee to "[t]he

[u]rgent [n]eed for a Tolling Agreement . . . in light of potential expiring statute of limitations deadlines," and expressed their belief that "it [w]as imperative that the Trustee act expeditiously to request such an agreement."[2]

When the trustee neither sought a tolling agreement nor brought suit against DBSP, the two certificateholders sued DBSP on March 28, 2012 -- six years to the day from the date of contract execution -- by filing a summons with notice on behalf of the Trust.  The summons with notice alleged a single cause of action for breach of contract based on DBSP's alleged material breach of representations and warranties and failure to comply with its contractual repurchase obligation.  The certificateholders asked for specific performance and damages to the tune of $250 million.

On September 13, 2012, the trustee sought to substitute for the certificateholders, and filed a complaint on the Trust's behalf.  In the complaint, the Trust alleged breaches of representations and warranties and DBSP's refusal to comply with its repurchase obligation.  The Trust asserted that it had promptly notified DBSP of the breaches of representations and warranties on February 8, March 23, April 23, April 30, May 11,

---

[2]Tolling agreements are hardly unheard-of in connection with RMBS loan repurchase (or "put-back") litigation.  For example, JPMorgan Chase executed one in November 2013 with the Trustees of several RMBS trusts as part of a massive settlement negotiation (available at JPMorgan's RMBS settlement website http://www.rmbstrusteesettlement.com).

May 16, May 31, June 7 and July 19, 2012; and that each of these notices specified the defective or non-conforming loans, detailed specific breaches for each loan and supplied supporting documentation.  The Trust suggested that the pre-suit 60- and 90-day condition precedent was satisfied because, as of the date of its complaint, DBSP had still not repurchased any loans, and "refuse[d] to recognize the [notices of breach] as sufficient to trigger [DBSP's] cure or repurchase obligations."

On November 30, 2012, DBSP moved to dismiss the complaint as untimely, arguing that the trustee's claims accrued as of March 28, 2006, more than six years before the Trust filed its complaint.  Moreover, DBSP contended that the certificateholders' summons and notice was a nullity because they did not give DBSP 60 days to cure and 90 days to repurchase before bringing suit; that the certificateholders lacked standing because only the trustee was authorized to sue for breaches of representations and warranties; and that the trustee's substitution could not relate back to March 28, 2012 because there was no valid pre-existing action.

Supreme Court denied DBSP's motion to dismiss (40 Misc 3d 562 [Sup Ct, NY County 2013]).  The judge reasoned that DBSP could not have breached its repurchase obligations until it "fail[ed] to timely cure or repurchase a loan following discovery or receipt of notice of a breach of a representation or warranty" (id. at 566).  In Supreme Court's view, "[t]he whole point of how

the MLPA and PSA were structured was to shift the risk of noncomplying loans onto DBSP" (id. at 567).  Thus, the argument "that the trustee's claims accrued in 2006 . . . utterly belies the parties' relationship and turn[ed] the PSA on its head" (id.).  The court concluded instead that DBSP's cure or repurchase obligation was recurring and that DBSP committed an independent breach of the PSA each time it failed to cure or repurchase a defective loan; therefore, the judge held the Trust's action to be timely.  Supreme Court also determined that the Trust had satisfied the condition precedent to suit insofar as DBSP affirmatively repudiated any obligation to repurchase.

The Appellate Division reversed and granted DBSP's motion to dismiss the complaint as untimely (112 AD3d 522 [1st Dept 2013]).  The court held that "the claims accrued on the closing date of the MLPA, March 28, 2006, when any breach of the representations and warranties contained therein occurred" (id. at 523).  Further, although the certificateholders commenced their action on March 28, 2012, the last day of the six-year statute of limitations for contract causes of action, the 60- and 90-day periods for cure and repurchase had not by then elapsed; accordingly, the certificateholders "fail[ed] to comply with a condition precedent to commencing suit [that] rendered their summons with notice a nullity" (id.).  The Appellate Division added that, in any event, the certificateholders lacked standing to commence the action on behalf of the Trust and the Trust's

substitution did not cure that defect and relate back to the certificateholders' date of filing.

On June 26, 2014, we granted the Trust leave to appeal (23 NY3d 906 [2014]).  We now affirm.

## II.

### Accrual

Our statutes of limitation serve the same objectives of finality, certainty and predictability that New York's contract law endorses.  Statutes of limitation not only save litigants from defending stale claims, but also "express[] a societal interest or public policy of giving repose to human affairs" (John J. Kassner & Co. v City of New York, 46 NY2d 544, 550 [1979] [internal citations and quotation marks omitted]).  And we have repeatedly "rejected accrual dates which cannot be ascertained with any degree of certainty, in favor of a bright line approach" (MRI Broadway Rental v United States Min. Prods. Co., 92 NY2d 421, 428 [1998]).

Accordingly, New York does not apply the "discovery" rule to statutes of limitations in contract actions (Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 403 [1993]).  Rather, the "statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury" (id. [citations omitted]).  This is so even though the result may at times be "harsh and manifestly unfair, and creates

an obvious injustice" because a contrary rule "would be entirely dependent on the subjective equitable variations of different Judges and courts instead of the objective, reliable, predictable and relatively definitive rules that have long governed this aspect of commercial repose" (id.).  Indeed, "[t]o extend the highly exceptional discovery notion to general breach of contract actions would effectively eviscerate the Statute of Limitations in this commercial dispute arena" (id.).  We applied the same bright-line rule just three years ago in the insurance context with respect to retrospective premiums, holding that breach of contract counterclaims "began to run when [insurers] possessed the legal right to demand payment from the insured," not years later when they actually made the demand (Hahn Automotive Warehouse, Inc. v American Zurich Ins. Co., 18 NY3d 765, 767 [2012]).

The Trust does not dispute this precedent, but rather seeks to persuade us that its claim did not arise until DBSP refused to cure or repurchase, at which point the Trust, either through the trustee or the certificateholders, had six years to bring suit.  Thus, the Trust views the repurchase obligation as a distinct and continuing obligation that DBSP breached each time it refused to cure or repurchase a non-conforming loan.  Stated another way, the Trust considers the cure or repurchase obligation to be a separate promise of future performance that continued for the life of the investment (i.e., the mortgage

loans).

Although parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date, the repurchase obligation undertaken by DBSP does not fit this description. To support its contrary position, the Trust relies on our decision in Bulova Watch Co. v Celotex Corp. (46 NY2d 606 [1979]), where we considered whether the separate repair clause in a contract for the sale of a roof constituted a future promise of performance, the breach of which created a cause of action. The separate clause the seller included in that contract was a "20-Year Guaranty Bond," which "expressly guaranteed that [the seller] would 'at its own expense make any repairs . . . that may become necessary to maintain said Roof'" (id. at 608).

We held that the guarantee "embod[ied] an agreement distinct from the contract to supply roofing materials," the breach of which triggered the statute of limitations anew (id. at 610). This was so because the defendant in Bulova Watch "did not merely guarantee the condition or performance of the goods, but agreed to perform a service" (id. at 612). That service was the separate and distinct promise to repair a defective roof -- a critical component of the parties' bargain and "a special, separate and additional incentive to purchase" the defendant's product (id. at 611). Accordingly, the "agreements contemplating services[] were subject to a six-year statute [] running

separately for the damages occasioned each time a breach of the obligation to repair the bonded roof occurred" (id.).

The remedial clause in Bulova Watch expressly guaranteed future performance of the roof and undertook a promise to repair the roof if it did not satisfy the seller's guarantee. DBSP, by contrast, never guaranteed the future performance of the mortgage loans.  It represented and warranted certain facts about the loans' characteristics as of March 28, 2006, when the MLPA and PSA were executed, and expressly stated that those representations and warranties did not survive the closing date. DBSP's cure or repurchase obligation was the Trust's remedy for a breach of those representations and warranties, not a promise of the loans' future performance.  In fact, nothing in the contract specified that the cure or repurchase obligation would continue for the life of the loans.  Unlike the separate guarantee in Bulova Watch, DBSP's cure or repurchase obligation could not reasonably be viewed as a distinct promise of future performance. It was dependent on, and indeed derivative of, DBSP's representations and warranties, which did not survive the closing and were breached, if at all, on that date.[3]

_____

[3]The Brief of Amici Curiae New York Law Professors helpfully analogizes the guarantees in this case and in Bulova Watch to UCC warranties: Under the New York UCC, claims based on breaches of warranty are covered by a four-year statute of limitations running from the date of delivery.  Claims based on express guarantees of future performance, by contrast, are treated as arising on the future date when those express and separate guarantees are breached (NY UCC Law §§ 2-725[1], [2]).  The

And it makes sense that DBSP, as sponsor and seller, would not guarantee future performance of the mortgage loans. A sponsor does not guarantee payment for the life of the transaction because loans may default 10 or 20 years after they have been issued for reasons entirely unrelated to the sponsor's representations and warranties. The sponsor merely warrants certain characteristics of the loans, and promises that if those warranties and representations are materially false, it will cure or repurchase the non-conforming loans within the same statutory period in which remedies for breach of contract (i.e., rescission and expectation damages) could have been sought.[4]

---

promise in Bulova Watch was an express guarantee of future performance, whereas the cure or repurchase obligations in this case were directly tied to DBSP's warranties and thus did not arise on a future date.

[4]Even without reference to the Appellate Division's decision in this case, the overwhelming majority of courts agree that cure or repurchase provisions in similar MLPAs do not give rise to a separate and independent cause of action that accrues on the date when the sponsor refuses to cure or repurchase individual loans (see e.g., Lehman Bros. Holdings v Universal Am. Mtge. Co., LLC, 2014 WL 4269118, *3-4 [D Colo, Aug. 28, 2014, No. 13-Civ-0092]; Wells Fargo Bank, N.A. v JPMorgan Chase Bank, N.A., 2014 WL 1259630, *3-4 [SD NY, Mar. 27, 2014, No. 12-CV-6168]; ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 v DB Structured Prods., Inc., 5 F Supp 3d 543, 552 [SD NY 2014]; Aurora Commercial Corp. v Standard Pac. Mtge., Inc., 2014 WL 1056383, *4-5 [D Colo, Mar. 19, 2014, No. 12-civ-3138]; Deutsche Alt-A Sec. Mtge. Loan Trust, Series 2006-OA1 v DB Structured Prods., Inc., 958 F Supp 2d 488, 499 [SD NY 2013]; Deutsche Bank Natl. Trust Co. v Decision One Mtge. Co., LLC, 2013 WL 6284438, *7 [Ill Cir Ct, Nov. 19, 2013, No. 2013L005823]; Lehman Bros. Holdings, Inc. v Evergreen Moneysource Mtge. Co., 793 F Supp 2d 1189, 1194 [WD Wash 2011]; Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4 v Nomura Credit & Capital, Inc., 39 Misc 3d

If the cure or repurchase obligation did not exist, the Trust's only recourse would have been to bring an action against DBSP for breach of the representations and warranties. That action could only have been brought within six years of the date of contract execution. The cure or repurchase obligation is an alternative remedy, or recourse, for the Trust, but the underlying act the Trust complains of is the same: the quality of the loans and their conformity with the representations and warranties. The Trust argues, in effect, that the cure or repurchase obligation transformed a standard breach of contract remedy, i.e. damages, into one that lasted for the life of the investment -- decades past the statutory period. But nothing in the parties' agreement evidences such an intent. Historically, we have been "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. . . . [C]ourts may not by construction add or excise terms, nor distort the meanings of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [internal quotation marks and citations omitted]).

### Condition Precedent

The Trust's strongest argument is that the cure or

---

1226(A), [Sup Ct, NY County, May 10, 2013]; Structured Mtge. Trust 1997-2 v Daiwa Fin. Corp., 2003 WL 548868, *2 [SD NY, Feb. 25, 2003, No. 02-CV-3232]).

repurchase obligation was a substantive condition precedent to suit that delayed accrual of the cause of action.  In that vein, the Trust claims it had no right at law to sue DBSP until DBSP refused to cure or repurchase the loans within the requisite time period; only then did the PSA permit the Trust to bring suit to enforce that distinct contractual obligation.  While this argument is persuasive-sounding, we are unconvinced.

The Trust ignores the difference between a demand that is a condition to a party's performance, and a demand that seeks a remedy for a pre-existing wrong.  We observed the distinction over 100 years ago in Dickinson v Mayor of City of N.Y. (92 NY 584, 590 [1883]).  There, we held that a 30-day statutory period during which the City of New York was free from litigation while it investigated claims did not affect accrual of the cause of action against the City.  In such a case, where a legal wrong occurred and the only impediment to recovery is the defendant's discovery of the wrong and notice to the defendant, the claim accrues immediately.  We contrasted that situation, however, to one in which "a demand . . . was a part of the cause of action and necessary to be alleged and proven, and without this no cause of action existed" (id. at 591, distinguishing Fisher v Mayor of City of N.Y., 67 NY 73 [1876]).

The Trust suffered a legal wrong at the moment DBSP allegedly breached the representations and warranties.  This is like the situation in Dickinson, and unlike the situation in

Fisher, where no cause of action existed until the demand was made. Here, a cause of action existed for breach of a representation and warranty; the Trust was just limited in its remedies for that breach. Hence, the condition was a procedural prerequisite to suit. If DBSP's repurchase obligation were truly the separate undertaking the Trust alleges, DBSP would not have breached the agreement until after the Trust had demanded cure and repurchase. But DBSP breached the representations and warranties in the parties' agreement, if at all, the moment the MLPA was executed (see e.g. ABB Indus. Sys. v Prime Tech., Inc., 120 F 3d 351, 360 [2d Cir 1997] [under CPLR 213 [2], a warranty of compliance with environmental laws "was breached, if at all, on the day (the contract) was executed, and therefore, the district court correctly concluded that the statute began to run on that day]; West 90th Owners Corp. v Schlechter, 137 AD2d 456, 458 [1st Dept 1988] ["The representation . . . was false when made. Thus, the breach occurred at the time of the execution of the contract"]). The Trust simply failed to pursue its contractual remedy within six years of the alleged breach.

The only cases the Trust relies on to support its position are inapposite. The court in Resolution Trust Corp. v Key Financial Serv., Inc. (280 F3d 12, 18 [1st Cir 2002]) specifically stated that it was not deciding the question of "[w]hether or not [the defendant] committed an independent breach by failing to repurchase" (id.). It affirmed the lower court on

other grounds.  The other cases the Trust cites either mistakenly rely on <u>Resolution Trust</u> as deciding something it expressly refrained from resolving (see <u>Lasalle Bank Natl Assn. v Lehman Bros. Holdings</u>, 237 F Supp 2d 618, 638 [D Md 2002] [citing only <u>Resolution Trust</u> for the proposition that "a loan seller's failure to repurchase non-conforming loans upon demand as required by contract is an independent breach of the contract entitling plaintiff to pursue general contract remedies for breach of contract"]; <u>Lehman Bros. Holdings, Inc. v Natl Bank of Arkansas</u>, 875 F Supp 2d 911, 917 [ED Ark 2012] [same]) or rely on Supreme Court's decision in this case, which the Appellate Division subsequently reversed (see <u>FHFA v WMC Mtge., LLC</u>, 2013 WL 7144159, *1 [SD NY, Dec. 17, 2013]).

### III.

In sum, DBSP's cure or repurchase obligation was not a separate and continuing promise of future performance; rather, it was the Trust's sole remedy in the event of DPSP's breach of representations and warranties.  Viewed in this light, the cure or repurchase obligation was not an independently enforceable right, nor did it continue for the life of the investment. Accordingly, the Trust's claim, subject to the six-year statute of limitations for breach-of-contract actions, accrued on March 28, 2006, when the MLPA was executed.  Moreover, DBSP's failure to cure or repurchase was not a substantive condition precedent that deferred accrual of the Trust's claim; instead, it was a

procedural prerequisite to suit.  Finally, because the Trust admittedly failed to fulfill the condition precedent, we need not and do not address the issues of standing and relation back disputed by the parties.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

* * * * * * * * * * * * * * * * *

Order affirmed, with costs.  Opinion by Judge Read.  Chief Judge Lippman and Judges Pigott, Rivera, Stein and Fahey concur.  Judge Abdus-Salaam took no part.

Decided June 11, 2015