Federal Housing Finance Agency, AS CONSERVATOR FOR THE FEDERAL HOME LOAN MORTGAGE CORPORATION, on behalf of the Trustee of the MORGAN STANLEY ABS CAPITAL I INC. TRUST, SERIES 2007-NC1 (MSAC 2007-NC1), Plaintiff,

against
Morgan Stanley ABS Capital I Inc., Defendant.

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL HOME LOAN MORTGAGE CORPORATION, on behalf of the Trustee of the MORGAN STANLEY ABS CAPITAL I INC. TRUST, SERIES 2007-NC3 (MSAC 2007-NC3), Plaintiff,
against
MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC as Successor-by-Merger to MORGAN STANLEY MORTGAGE CAPITAL INC., Defendant.

650291/2013

Counsel for the plaintiff trustee:
Molo Lamken LLP
Steven F. Molo
Robert K. Kry
Lauren M. Weinstein
Counsel for defendants:
Davis Polk & Wardwell LLP
James P. Rouhandeh
Brian S. Weinstein
Elisabeth Grippando
Alan J. Tabak
Matthew Cormack


Marcy Friedman, J.

These separate residential mortgage-backed securities (RMBS) breach of contract actions are based upon defendant securitizers' alleged breaches of representations and warranties regarding the quality and characteristics of mortgage loans held in two Trusts: Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 (NC1) and Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 (NC3) (collectively, the Securitizations or Trusts).[FN1]
The facts and procedural [*2]history of these actions are described at length in this court's prior decisions on the defendants' respective motions to dismiss, Federal Housing Finance Agency v Morgan Stanley ABS Capital I Inc. (2016 WL 1587345 [Sup Ct, NY County, Apr. 12, 2016, No. 650291/2013] [FHFA (NC1)]) and Federal Housing Finance Agency v Morgan Stanley Mortgage Capital Holdings LLC, 2016 WL 1587344 [Sup Ct, NY County, Apr. 12, 2016, No. 651959/2013] [FHFA (NC3)] [collectively, the Prior Decisions]). Those decisions were affirmed by the Appellate Division in Federal Housing Finance Agency v Morgan Stanley ABS Capital I Inc. (146 AD3d 566 [1st Dept 2017].)
In FHFA (NC1), the initial complaint pleaded three separate breach of contract causes of action against defendant Morgan Stanley ABS Capital I Inc. (MSAC): a first cause of action for breach of representations and warranties regarding the securitized loans; a second cause of action for breach of MSAC's obligation to notify Deutsche Bank National Trust Company (the Trustee) upon MSAC's discovery of breaches of representations and warranties; and a third cause of action for breach and anticipatory breach of MSAC's purportedly separate obligation to cure or repurchase defective loans. In an amended complaint filed on February 3, 2014, the Trustee added a fourth cause of action against MSAC for breach of the implied covenant of good faith and fair dealing, based on the same underlying allegations. In FHFA (NC3), the complaint pleaded two breach of contract causes of action against defendant Morgan Stanley Mortgage Capital Holdings LLC, the alleged successor of Morgan Stanley Mortgage Capital Inc. (collectively MSMC): a first cause of action for both breach of representations and warranties and failure to cure or repurchase defective loans; and a second cause of action for breach of the implied covenant of good faith and fair dealing.
In the Prior Decisions, the court dismissed the Trustee's breach of representations and warranties causes of action, based on the statute of limitations.[FN2]
The court dismissed the Trustee's causes of action for failure to repurchase defective loans, on the ground that the failure to repurchase did not give rise to a separate cause of action. In addition, the court dismissed the causes of action for breach of the implied covenant of good faith and fair dealing as duplicative of the contract claims.[FN3]

This decision concerns the timeliness and viability of the Trustee's claims that defendant MSAC breached its contractual obligations by failing to notify the Trustee of breaches of representations and warranties. These claims are referred to in the coordinated RMBS litigation as "failure to notify" claims.[FN4]
In the Prior Decisions, and in a number of other substantially similar decisions in the RMBS litigation,[FN5]
this court deferred decision on whether the trustees had pleaded or could plead timely failure to notify claims. The court requested coordinated briefing on the scope and viability of such claims following a then-recent decision of the Appellate Division, which recognized an independent contractual cause of action based on a securitizer's failure to notify the trustee of its discovery of breaches. (Nomura Home Equity Loan, Inc. v Nomura Credit & Capital, Inc. (133 AD3d 96 [1st Dept 2015], mod on other grounds 30 NY3d 572, 2017 WL 632110 [NY, Dec. 12, 2017]; Morgan Stanley Mtge. Loan Trust 2006-13ARX v Morgan Stanley Mtge. Capital Holdings LLC (143 AD3d 1 [1st Dept 2016], appeal docketed No. APL-2016-00240 [Morgan Stanley] [decided after FHFA (NC1) and FHFA (NC3)]; Bank of NY Mellon v WMC Mtge., LLC, 151 AD3d 72, 81 [1st Dept 2017] [BNYM]; Second Case Management Order, dated Mar. 24, 2016, § V [Index. Nos. 777000/2015] [NYSCEF No. 96].) 
In connection with this briefing, the court granted leave to defendant MSAC in FHFA (NC1) to renew its motion to dismiss the Trustee's failure to notify claim. The court also granted leave to the Trustee in FHFA (NC3) to move to amend its complaint to add a failure to notify claim. The parties to the coordinated litigation subsequently decided to argue these motions as "bellwether cases" with respect to the scope and viability of failure to notify claims. This decision is the first in which this court has addressed failure to notify claims following the Appellate Division decisions in Nomura, Morgan Stanley, and BNYM, which are discussed in detail below.

BACKGROUND
Although these cases involve separate RMBS Trusts, the complaints and governing agreements in each action are materially similar. The defendant in FHFA (NC3), MSMC, was [*3]the Sponsor of both Securitizations. (NC3 Proposed Am. Compl., ¶¶ 11, 17 [Weinstein Aff. In Supp., Exh. 5]; NC1 Am. Compl., ¶ 14.) The defendant in FHFA (NC1), MSAC, served as the Depositor for both Securitizations. (NC1 Am. Compl., ¶¶ 1-2, 14-15; NC3 Proposed Am. Compl., ¶ 17.) Federal Housing Finance Agency (FHFA), acting as conservator for The Federal Home Loan Mortgage Corporation (Freddie Mac), a certificateholder in both Trusts, commenced the actions by filing a summons with notice in FHFA (NC1) on January 25, 2013, and in FHFA (NC3) on May 31, 2013. The Trustee subsequently filed complaints and sought to substitute itself as plaintiff in both actions.
The NC1 and NC3 Securitizations closed, respectively, on January 26, 2007 and May 31, 2007. (NC1 Am. Compl. ¶ 12; NC3 Proposed Am. Compl. ¶ 17.) MSAC in FHFA (NC1), and MSMC in FHFA (NC3), made numerous representations and warranties about the quality and characteristics of the underlying mortgage loans or "backed" representations and warranties made by another party. These representations and warranties were stated to be true as of the closing dates. (See NC1 Am. Compl., ¶¶ 20-21; NC1 Pooling and Servicing Agreement [PSA], §§ 2.03 (b), (f) & Sched. III [Weinstein Aff. In Supp., Exh. 3]; NC3 Proposed Am. Compl., ¶ 25; NC3 Representations and Warranties Agreement [RWA], §§ 2, 4 (a) & Exh. 1, Parts A-B [Weinstein Aff. In Supp., Exh. 7]; NC3 PSA, § 2.01 [a] [Weinstein Aff. In Supp., Exh. 6]; see also Tee.'s Opening Memo., at 4 [describing the relevant agreements and provisions].[FN6]
) 
As is typical in RMBS transactions, the agreements governing each of the Securitizations set forth a "repurchase protocol" in which, upon either notice to or discovery by MSAC in FHFA (NC1) or MSMC in FHFA (NC3) of any breach of a representation or warranty that materially and adversely affected the value of any mortgage loan or the interest of the Trustee or certificateholders, the respective defendant was required to cure, substitute, or repurchase such loan(s). (NC1 PSA, § 2.03 [f]; NC3 RWA, § 4 [a].) The repurchase protocol (and, in FHFA [NC1], related indemnification obligations) was the sole remedy available to the Trustee for such breaches. (NC1 PSA, § 2.03 [m]; NC3 RWA, § 4 [c].)[FN7]
The PSA governing each Securitization [*4]also required MSAC to notify the Trustee of any breaches of representations and warranties it discovered. (NC1 PSA § 2.03 [d]; NC3 PSA § 2.07.) It does not appear that MSMC had a similar notification obligation.[FN8]

The Trustee pleaded in both actions, among other things, that numerous loans were affected by material breaches of representations and warranties, and that defendants failed and/or refused to repurchase such loans. (See NC1 Am. Compl., ¶¶ 79-92, 103-116 [pleading such [*5]claims against MSAC only]; NC3 Compl., ¶¶ 60, 64 [pleading such claims against MSMC only].) The Trustee in FHFA (NC1) also pleaded that defendant MSAC breached its duty to notify the Trustee upon its discovery of breaches of representations and warranties. (NC1 Am. Compl., ¶¶ 93-102.) As stated above, the complaint in FHFA (NC3) did not plead a failure to notify claim against MSMC, the sole defendant in that case.
Although the parties' briefing refers to "defendants" collectively, as "Morgan Stanley," a close review of the record reveals that the Trustee does not in fact seek to plead a failure to notify claim against MSMC in either action—not even in FHFA (NC3), in which MSMC currently is the sole defendant. Rather, the Trustee opposes dismissal of its failure to notify claim against MSAC in FHFA (NC1), and seeks to amend the complaint in FHFA (NC3) to plead a failure to notify claim against MSAC in that action. MSMC's interest in these motions thus is not immediately apparent. The court will nonetheless follow the parties' convention in referring to "defendants'" arguments in this decision. 
DISCUSSION 
A. Background on Failure to Notify Claims
The failure to notify claims asserted or sought to be asserted by the Trustee in these actions cannot properly be addressed without careful consideration of the Court of Appeals decision in ACE and the Appellate Division's more recent decisions in Nomura, Morgan Stanley, and BNYM. As discussed further below, ACE, among other things, rejected the claim that a defendant securitizer's breach of its repurchase obligation gives rise to a cause of action independent of a cause of action against the securitizer for breach of representations and warranties. The Appellate Division decisions accepted the claim that a defendant securitizer's or originator's breach of its obligation to notify the trustee of its discovery of breaches of representations and warranties does give rise to an independent cause of action.
1. The ACE Decision
In ACE (25 NY3d 581, supra), the Court of Appeals determined the accrual date of a breach of contract claim against an RMBS securitizer (there, a sponsor) "based on [the sponsor's] alleged material breach of representations and warranties and failure to comply with its contractual repurchase obligation." (Id., at 592.) The Court held that the plaintiff trustee's claim accrued when the representations and warranties at issue were made—there, "the point of contract execution." (Id., at 589.) In support of this holding, the Court cited extensive precedent that "the 'statutory period of limitations [for a breach of contract claim] begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury.'" (Id., at 594, quoting Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 403 [1993].) As explained by the Court: "Where, as in this case, representations and warranties concern the characteristics of their subject as of the date they are made, they are breached, if at all, on that date . . . ." (Id., at 589.) Whether or not the trustee or any party was then aware of defects in the loans, the remedy of repurchase was available as of that date.
The Court further held that the defendant sponsor's "refusal to repurchase the allegedly defective mortgages did not give rise to a separate cause of action." (Id.) The Court rejected the plaintiff's view of the "repurchase obligation as a distinct and continuing obligation that [the sponsor] breached each time it refused to cure or repurchase a non-conforming loan" or, stated differently, as "a separate promise of future performance that continued for the life of the investment (i.e., the mortgage loans)." (Id., at 594.) Although the Court noted that "parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date," the Court determined that "the repurchase obligation undertaken by [the sponsor] does not fit this description." (Id.) 
The Court distinguished its prior decision in Bulova Watch Co. v Celotex Corp. (46 NY2d 606 [1979]), a case in which the plaintiff had sued to enforce a repair clause in a contract for the sale of a roof. The Court noted that the defendant roof seller in Bulova Watch had "not merely guarantee[d] the condition or performance of the goods [roofing materials]" supplied by it as of the time of contracting. The defendant had also made a "separate and distinct promise" to perform a future "service"—namely, to "make any repairs that may become necessary to maintain said Roof." (ACE, 25 NY3d at 595 [internal quotation marks, citations, and ellipses omitted].) The Court reasoned that "[t]he remedial clause in Bulova Watch expressly guaranteed future performance of the roof and undertook a promise to repair the roof if it did not satisfy the seller's guarantee." (Id. [emphasis in original].) This separate promise in Bulova Watch was "a critical component of the parties' bargain and a special, separate and additional incentive to purchase the defendant's product." (Id. [internal quotation marks and citation omitted].) 
The Court further held that the sponsor in ACE, in contrast, "never guaranteed the future performance of the mortgage loans." (Id.) The sponsor's "cure or repurchase obligation was the Trust's remedy for a breach of [] representations and warranties" and "could not reasonably be viewed as a distinct promise of future performance. It was dependent on, and indeed derivative of, [the sponsor's] representations and warranties, which did not survive the closing and were breached, if at all, on that date." (Id.) The Court noted that, "[i]f the cure or repurchase obligation did not exist, the Trust's only recourse would have been to bring an action against [the sponsor] for breach of the representations and warranties," and that such an action "could only have been brought within six years of the date of contract execution." (Id., at 596.) The repurchase obligation was thus "an alternative remedy, or recourse, for the Trust, but the underlying act the Trust complain[ed] of [wa]s the same: the quality of the loans and their conformity with the representations and warranties." (Id. [emphasis in original].)
The Court also rejected the plaintiff's contention "that the cure or repurchase obligation was a substantive condition precedent to suit that delayed accrual of the cause of action" for breach of representations and warranties, and that the plaintiff "had no right at law to sue [the sponsor] until [the sponsor] refused to cure or repurchase the loans . . . ." (Id., at 597.) The Court referred to this contention as the plaintiff's "strongest argument," but held that the argument "ignore[d] the difference between a demand that is a condition to a party's performance, and a demand that seeks a remedy for a preexisting wrong." (Id. [emphasis in original].) "[W]here a legal wrong has occurred and the only impediment to recovery is [] discovery of the wrong and notice to the defendant, the claim accrues immediately." (Id. [emphasis in original].) The Court contrasted that situation "to one in which a demand was a [*6]part of the cause of action and necessary to be alleged and proven, and without this no cause of action existed." (Id. [internal quotation marks, citation, and ellipses omitted].) The Court reiterated that "[t]he Trust suffered a legal wrong at the moment [the sponsor] allegedly breached the representations and warranties." (Id.) 
The Court summarized its holdings as follows: 
"In sum, [the sponsor's] cure or repurchase obligation was not a separate and continuing promise of future performance; rather, it was the Trust's sole remedy in the event of [the sponsor's] breach of representations and warranties. Viewed in this light, the cure or repurchase obligation was not an independently enforceable right, nor did it continue for the life of the investment. . . . Moreover, [the sponsor's] failure to cure or repurchase was not a substantive condition precedent that deferred accrual of the Trust's claim; instead, it was a procedural prerequisite to suit."[FN9]

(Id., at 598-599.)

2. Trial Court Decisions Addressing Failure to Notify Claims Following the ACE Decision
As the Trustee correctly argues on these motions, ACE did not address or involve a breach of contract claim based on an RMBS securitizer's obligation to notify the trustee of breaches of representations and warranties. Both before and after the ACE decision, however, Courts faced with such claims repeatedly concluded that a securitizer's obligation to notify a trustee of defective loans—like its obligation to repurchase such loans—is part of the trustee's contractual remedy for breaches of representations and warranties, is "dependent on, and indeed derivative of, [the] representations and warranties" (see 25 NY3d at 595), and is therefore not a "separate and continuing promise of future performance" or "an independently enforceable right" subject to its own accrual rules. (See id., at 598-599.) 
In Morgan Stanley Mortgage Loan Trust 2006-13ARX v Morgan Stanley Mortgage Capital Holdings LLC (2014 WL 4829638, * 2 [Sup Ct, NY County, Sept. 25, 2014, No. 653429/2012], revd 143 AD3d at 7), this court reasoned that, under the Appellate Division's decision in ACE (112 AD3d 522, supra), a sponsor's non-compliance with a repurchase protocol, a mere remedy, does not give rise to an independent breach of contract by the sponsor. This court further held that a cause of action for a sponsor's failure to notify the trustee of defective loans is yet another way of asserting that breaches of the repurchase protocol constitute independent breaches of the contract which are not subject to the limited (that is, sole) remedy for breaches of representations and warranties agreed to by the parties. The court adhered to this decision in later decisions. (See e.g. Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. Corp., 2015 WL 1646683, * 3 [Sup Ct, NY County, Apr. 13, 2015, No. 653048/2013], affd on other grounds 143 AD3d 15 [1st Dept 2016]; Law Debenture Trust Co. of NY v DLJ Mtge. Capital, Inc., 2015 WL 1573381 [Sup Ct, NY County, Apr. 8, 2015, No. 651958/2013]; U.S. [*7]Bank Natl. Assn. v DLJ Mtge. Capital, Inc., 2015 WL 298642, * 2 [Sup Ct, NY County, Jan. 16, 2015, No. 652699/2013].)
This reasoning was consistent with that of other Courts after ACE. (See Bank of NY Mellon v WMC Mtge., LLC (50 Misc 3d 229, 236-237 [Sup Ct, NY County, Sept. 18, 2015, No. 653831/2013, Kornreich, J.] [holding that the defendant's obligation to notify and the repurchase obligation "both are components of the repurchase protocol" and that, "[a]fter ACE, the notion that a separate failure to notify claim is viable should be put to rest"], mod 151 AD3d 72; Federal Hous. Fin. Agency v WMC Mtge., LLC, 2015 WL 9450833, * 3-4 [SD NY, July 10, 2015, No. 13 Civ 584, Hellerstein, J.] [holding that ACE did not address the accrual of a failure to notify claim, but that the ACE Court's reasoning applies; that the duty to notify is "an obligation dependent on and derivative of the representations and warranties"; and that "[i]f the duty to cure or repurchase, which is the sole remedy available for a breach of the representations and warranties, expired after the six-year statute of limitations period had run, an ongoing duty to notify which lasted for the lifetime of the mortgages would yield no relief for the aggrieved parties"].)
3. The Nomura, Morgan Stanley, and BNYM Decisions
The legal landscape regarding failure to notify claims changed abruptly with the Appellate Division's decisions in Nomura, Morgan Stanley, and BNYM. First, in Nomura, the Appellate Division held that this court had "correctly declined to permit plaintiffs to pursue damages for defendant's failure to repurchase defective loans (see ACE Sec. Corp., 25 NY3d at 589)." (Nomura, 133 AD3d at 108.) The Court further held, without discussion, that this court had "erred in not allowing plaintiffs to pursue damages for [the] defendant's failure to give prompt written notice after it discovered material breaches of [] representations and warranties . . . ." (Id.) Although the Court thus distinguished between the repurchase and notification obligations, it did not expressly address the impact of ACE on the viability of a cause of action based on the notification obligation, and did not expressly hold that a securitizer's failure to notify a trustee of defective loans may form the basis for a separate and independent cause of action for breach of contract. 
The Appellate Division clarified Nomura in Morgan Stanley. The Court characterized its prior decision in Nomura as "holding that . . . a seller's failure to provide the trustee with notice of material breaches it discovers in the underlying loans states an independently breached contractual obligation, allowing a plaintiff to pursue separate damages. (Nomura, 133 AD3d at 108)." (Morgan Stanley, 143 AD3d at 7.) The Court then modified this court's decision to the extent of reinstating the dismissed failure to notify claims. (Id.) The Morgan Stanley Court did not address ACE. It appears, however, that the Court rejected this court's reasoning that the notification obligation, like the repurchase obligation, is part of the repurchase remedy and, under ACE, does not support an independent cause of action.
Finally, in BNYM, the Appellate Division modified the decision of the trial court (Kornreich, J.) to the extent, among other things, of reinstating a failure to notify claim by the plaintiff securities administrator against the defendant servicer. The Court reaffirmed that "the contractual obligation to notify [i]s independent of the warranty obligations," and characterized [*8]its prior decisions as holding that "claims for failure to notify were not claims 'respecting a warranty breach' subject to the 'sole remedy' clause" of the governing agreements in those cases. (151 AD3d at 81.) In support of a further holding that the failure to notify claim against the servicer did not "contravene the Court of Appeals' decision in ACE," the Court reasoned that "the servicer is not subject to the repurchase protocol at all," and that, "[a]s a result, because [the servicer] has no obligations under the repurchase protocol, that protocol cannot bar a cause of action against it for an independent duty to notify." (Id.)
B. The Accrual Rule for the Failure to Notify Claims in These Actions
The Trustee argues that, although its underlying claims for breaches of representations and warranties are time-barred and its claims for failure to repurchase are not viable, it has timely claims based on MSAC's failure to notify it of breaches. Defendants argue that the failure to notify claim in FHFA (NC1) and the proposed failure to notify claim in FHFA (NC3) are barred by the statute of limitations.
More particularly, defendants contend that failure to notify claims are subject to the same statute of limitations as claims for breaches of representations and warranties, and accrue on the date on which the underlying representations and warranties are made. Defendants reason that the obligation to notify is "dependent on and derivative of the underlying claims for breach of R & Ws [representations and warranties]," "goes hand in hand with the duty to cure or repurchase," and is "designed to remedy the underlying harm, which is the existence of allegedly breaching loans in the Trust." (Defs.' Opening Memo., at 3, 10-11, 13.) Defendants accordingly assert that "[i]f, as the Court of Appeals held in ACE [], failing to repurchase a breaching loan does not give rise to a separate accrual, then failing to notify the Trustee that a loan is in breach and subject to repurchase certainly cannot do so." (Id., at 11.)
The Trustee counters that, under the Appellate Division holdings in Nomura and Morgan Stanley, breach of the duty to notify gives rise to a contract claim independent of, and separate from, a claim for breach of representations and warranties. (Tee.'s Opening Memo., at 2.) The Trustee contends that, "[b]ecause the duty to notify is a separate and independently enforceable obligation, it has its own statute of limitations, which does not start to run until that separate obligation is breached. As a result, the earliest that breach could have occurred—and the earliest the statute of limitations could have begun to run—is after [MSAC] discovered the defective loans but failed to notify the Trustee." (Id., at 3 [emphasis in original].)
As a threshold matter, based on the Appellate Division holdings in Nomura and Morgan Stanley that failure to notify claims are separate from and may be asserted independently of breach of representation and warranty claims, the court must reject defendants' contention that the accrual date of the failure to notify and breach of representation and warranty claims is necessarily the same—that is, the date on which the representations and warranties were made. This contention presupposes that the notification obligation, like the obligation to repurchase defective loans, is merely part of the Trusts' remedy for breach of representations and warranties, and is barred by ACE. As discussed above, in Morgan Stanley, the Appellate Division appears to have rejected this reasoning, which had been accepted by this court. (143 AD3d at 7, revg 2014 WL 4829638, at * 2.)
The court further rejects defendants' apparent contention that the Appellate Division's decision in U.S. Bank National Assn. v GreenPoint Mortgage Funding, Inc. (147 AD3d 79 [1st Dept 2016] [GreenPoint]) determined that the accrual date for the two causes of action is the same. (See Defs.' Reply Memo., at 8-10.) That case, which involved a breach of representations and warranties claim by a trustee against an originator, neither discusses the accrual of a failure to notify claim against the defendant nor suggests that such a claim accrues on the date the representations and warranties are made. Rather, the Court in GreenPoint addressed the separate question of whether written notice to a defendant of breaches of representations and warranties is a condition precedent to a put-back claim by a trustee, where the trustee alleges the defendant's independent discovery of breaches.[FN10]
The Court held that the defendant's obligation to repurchase defective loans could be "triggered in one of two ways"—either by notice of a breach or by its independent discovery of that breach. The Appellate Division then held that "[r]egardless of when GreenPoint discovers a breach or is notified of the nonconforming mortgage, the breach of contract cause of action accrues on the date of the closing of the underlying transaction, which is when the representations and warranties were made." (Id., at 85.)
Although the Appellate Division cited Nomura and Morgan Stanley in support of its holding that there are two independent "trigger[s]" of the defendant's repurchase obligation, the claim at issue in GreenPoint was the trustee's claim for breach of representations and warranties, and the notice at issue was the trustee's notice (or lack thereof) to the defendant of breaches, not the defendant's notice to the trustee of breaches. Thus, nothing in the Court's holding addresses the notification obligation of a securitizer, which the Court in Nomura and Morgan Stanley held could form the basis of a separate cause of action for breach of contract.[FN11]

Nor, since GreenPoint, has the Appellate Division determined that a failure to notify claim accrues when the representations and warranties are made. Natixis Real Estate Capital Trust 2007-HE2 v Natixis Real Estate Holdings, LLC (149 AD3d 127, 138-139 [1st Dept 2017]), decided after the parties to this case briefed the impact of the GreenPoint decision, applies an [*9]analysis similar to GreenPoint and cites Nomura and Morgan Stanley in the same manner—that is, in support of the Court's holding that discovery and notice were independent triggers of the defendant's (there, the sponsor's) repurchase obligation. That decision also does not address the accrual of failure to notify claims. In BNYM (151 AD3d 72, supra), the Appellate Division in fact permitted maintenance of a failure to notify claim against a servicer where no timely breach of representation and warranty claim was asserted against the party (there, the originator) that made the representations and warranties. The case did not, however, discuss the accrual date of the failure to notify claim.[FN12]
As the Appellate Division has not to date expressly addressed the accrual of the separate failure to notify claim that the Court has recognized, this court must do so by applying traditional accrual precepts.
It is well settled that a legal claim does not accrue until "a party c[an] obtain relief in court." (Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex., 87 NY2d 36, 43 [1995].) A claim for breach of contract, specifically, does not accrue until "the time of the breach." (Ely-Cruikshank Co., Inc., 81 NY2d at 402; Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 403 [1975] ["[I]n contract actions the statute [of limitations] runs from the date of the breach of performance of the contractual obligation"].)
It is further settled that "[t]he contractual language fixes the boundaries of the legal obligation of [a defendant]." (Phoenix Acquisition Corp. v Campcore, Inc., 81 NY2d 138, 141 [1993].) As is typical in RMBS governing agreements, the PSAs here required MSAC to give "prompt written notice" to the trustee "[u]pon discovery . . . of a breach" of representations and warranties that materially and adversely affects the value of the loan or the interests of the certificateholders. (See PSAs, quoted supra, at 6-7 n 8.) The express terms of these unambiguous provisions support the Trustee's contention, and the court holds, that a defendant does not breach its notification obligation until it discovers a breach of representations and warranties and fails to give prompt written notice to the Trustee. 
In concluding that a discovery based accrual rule applies to the Trustee's failure to notify claims, the court has considered defendants' forceful arguments that a failure to notify claim that accrues upon a securitizer's discovery of a breach of representations and warranties would violate New York public policy and contravene the holdings and spirit of two critical RMBS decisions: ACE (25 NY3d 581, supra), in which the Court of Appeals reiterated that New York does not apply the "discovery rule" to breach of contract actions and established that the accrual [*10]date of a claim for breach of representations and warranties is the date on which the representations and warranties are made, regardless of the trustee's knowledge of the wrong; and Deutsche Bank National Trust Co. v Flagstar Capital Markets Corp. (143 AD3d 15, 19 [1st Dep't 2016] [Flagstar]), in which the Appellate Division declared unenforceable, on public policy grounds, a contract clause that purported to delay accrual of a claim for breach of representations and warranties. In both of these cases, RMBS trustees asserted that their contract claims did not accrue until a securitizer's discovery of defective loans and failure to take remedial action. 
In ACE, as previously discussed, the Court of Appeals held that a sponsor's repurchase obligation is not an independently enforceable obligation or a substantive condition precedent that delays the accrual of a claim for breach of representations and warranties. (See ACE, 25 NY3d at 598-599.) Recognition of the repurchase obligation as a separate promise or as a substantive condition precedent in that case would have resulted in claims accruing upon the defendant sponsor's discovery of defective loans and failure to repurchase such loans. In rejecting the trustee's arguments, the Court of Appeals noted that "statutes of limitation serve the [] objectives of finality, certainty and predictability"; that our Courts "have repeatedly rejected accrual dates which cannot be ascertained with any degree of certainty, in favor of a bright line approach"; and that "[a]ccordingly, New York does not apply the 'discovery' rule to statutes of limitations in contract actions." (Id., at 593-594 [internal quotation marks and citations omitted].) 
These policies were also relied upon by this court and the Appellate Division in declaring an "accrual clause" unenforceable in Flagstar. In that case, a trustee brought claims for breaches of representations and warranties against an originator more than six years after the securitization closing date on which the representations and warranties were made. The plaintiff argued that its claims were timely because an accrual clause in the governing agreement purported to delay their accrual until three conditions were satisfied: discovery by the defendant of a breach (independently or by notice to it); failure to cure, substitute, or repurchase; and demand upon the defendant for compliance with the agreement. (See Flagstar, 143 AD3d at 17-18.) The Appellate Division rejected that argument, holding "that the accrual provision is unenforceable as against public policy . . . ." (Id., at 16, citing ACE, 25 NY3d at 593-594.) The Court reasoned, in pertinent part, as follows:
"Not only would enforcement of the accrual provision, entered into at the inception of the breach, serve to 'postpone the time from which the period of limitation is to be computed" (Kassner, 46 NY2d at 551, quoting 1961 Rep of NY Law Rev Commn at 97, 98, reprinted in 1961 McKinney's Session Laws of NY at 1871), but it also would contravene the principle that 'New York does not apply the 'discovery' rule to statutes of limitations in contract actions' (ACE, 25 NY3d at 594). The accrual provision's set of conditions creates an imprecisely ascertainable accrual date—possibly occurring decades in the future, since some of the loans extend for 30 years—which the Court of Appeals has 'repeatedly rejected . . . in favor of a bright line approach' (id. at 593-594 [internal quotation marks omitted])."
(Id., at 20 [emphasis in original].) 

Here, defendants argue that, "[i]f the parties cannot extend the statute of limitations for remedying the underlying breaches of representations and warranties, even with an express contractual provision that intends to do just that, the same policy rationales prohibit the Trustee from seeking to achieve the same result by different contractual means." (Defs.' Reply Memo., at 14.) This argument is seemingly persuasive. Application of traditional accrual precepts to the failure to notify claims recognized in Nomura and Morgan Stanley, and the resulting determination that these claims accrue upon the securitizer's discovery of breaches and failure to provide notice, do appear to produce an outcome that is virtually indistinguishable from the outcome the Court of Appeals and Appellate Division avoided in ACE and Flagstar by holding that the repurchase obligation is not a separate obligation or a substantive condition precedent, and that accrual clauses are unenforceable. The principal damages sought by the Trustee reinforce the perception that the notification obligation—at least as relied upon by the Trustee here, where there are no timely claims for breaches of representations and warranties—is a means to extend the period in which a trustee can seek its remedy for breaches of representations and warranties. As discussed further below, the Trustee principally seeks damages sustained as a result of the Trustee's alleged inability, due to MSAC's purported failure to comply with its notification obligations, to exercise its repurchase remedy before the passage of the statute of limitations. (Oral Arg. Tr., at 31-32; Tee.'s Suppl. Memo., at 1-4; Tee.'s Reply Memo., at 4 [arguing that damages for failure to notify are "particularly appropriate where the defendant's refusal to notify the trustee of breaching loans prevented the trustee from commencing a timely repurchase action"].)
Defendants also correctly argue that application of a discovery based accrual rule to failure to notify claims raises concerns that such claims will arise "at uncertain points in the future," on dates "subject to dispute and intertwined with disputes on the merits." (Defs.' Reply Memo., at 11.) These concerns are not inconsiderable in RMBS cases, which generally involve representations and warranties pertaining to thousands of loans per securitization, any one of which might theoretically be reviewed by a defendant post-securitization.
Defendants' arguments as to the public policy concerns implicated by a discovery based accrual rule for failure to notify claims are compelling. Significantly, however, in claiming that this court should apply the same statute of limitations to both the failure to notify claims and the breach of representations and warranties claims, defendants fail to give effect to the Appellate Division's holding, which this court is bound to follow, that the duty to notify is an independent contractual obligation. Defendants also effectively invite this court to create a novel accrual rule under which the statute of limitations may begin to run even before the contractual notification obligation is breached. Defendants do not dispute that the PSAs expressly provide for notice to be provided upon defendant securitizer's (MSAC's) discovery of a breach of representations and warranties. Defendants do not cite, and this court is unaware, of any authority that would permit the court to ignore the contractual language and hold that the notification obligation is breached as a matter of law at the time the representations and warranties were made, rather than at the time the contract specifies that notice to the Trustee must be provided. This court thus concludes that, given the terms of the contractual provision that sets forth the independently enforceable notification obligation recognized by the Appellate Division, there is no viable alternative to a discovery based accrual rule for the failure to notify claims. 
It must be noted that this case is not like Flagstar, in which the contract provided that a claim for breach of representations and warranties that were made as of the closing date would not accrue until a later point specified in an "accrual clause." The representations and warranties were true or false as of the closing date and thus, under settled accrual principles, were breached as of that date. Here, in contrast, the PSAs do not delay the accrual date of the separate failure to notify claim. Rather, under the contractual clause that establishes the obligation to notify, that obligation itself is not breached until the defendant securitizer discovers a breach of representations and warranties and fails to give notice. 
Moreover, the notification obligation may be viewed as a promise of future performance, which is not necessarily breached at the time of entry into the contract when the promise to notify was made. Although the Court of Appeals and Appellate Division in ACE and Flagstar strongly indicated their disfavor of contractual arrangements calling for RMBS breach of contract claims to accrue upon a securitizer's discovery of a breach of representations and warranties and failure to take remedial action, the Court of Appeals also reiterated in ACE that "parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date . . . ." (ACE, 25 NY3d at 594.) The Court held in ACE that the repurchase obligation was not a promise of future performance. Here, because the Appellate Division has recognized an independent notification obligation, a different conclusion may be reached.
As also noted above, application of a discovery based accrual rule for the failure to notify claims raises concerns about the predictability of the accrual date for the claims. It bears emphasis that these concerns, although valid, are similar to those raised as a result of the determinations of the Appellate Division and this court that, under the remedial provisions typical in RMBS governing agreements, a trustee may maintain claims for breaches of representations and warranties not only where the trustee provides written notice to the defendant securitizer of breaches before commencing suit, but also where the defendant independently discovers breaches. The defendant's discovery of breaches is the alternative "trigger" of the repurchase obligation discussed in GreenPoint, which allows a trustee to commence a put-back action without first providing a breach notice to the defendant. Thus, in put-back actions based on defendant securitizers' independent discovery of breaches, as in failure to notify actions, the trustees' claims will be dismissed if they cannot ultimately prove that the defendants discovered breaches of representations and warranties. 
In both categories of actions, the viability of the trustees' claims cannot ordinarily be resolved at the pleading stage. Many put-back actions have been permitted to proceed in this and other Courts despite the trustees' inability to allege discovery on a loan-by-loan basis, based on the alleged existence of pervasive defects in the loan pools and the securitizers' due diligence. (See Natixis Real Estate Capital Trust 2007-HE2, 149 AD3d at 136-137, 139-140 [upholding pleading of breach of representation and warranty claims against defendant sponsor based on its discovery of breaches, where the complaint identified the representations and warranties that were breached and pleaded allegations that the sponsor performed due diligence on the loans, "that at least 60% of the loans in the Trust [were] defective, and that Natixis's due diligence 'would have revealed that Loans were plagued with defects'"]; see also Nomura, 133 AD3d at 108; ACE Secs. Corp. HELT Series 2007-ASAP2 v DB Structured Prods., Inc., 2014 WL [*11]4785503, * 4-6 [Sup Ct, NY County, Aug. 28, 2014, No. 651936/2014] [this court's prior decision, citing federal and state authorities and summarizing allegations of discovery that have been held sufficient]; Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2006-S4 v Nomura Credit & Capital, Inc., 2014 WL 2890341, * 15 [Sup Ct, NY County, June 26, 2014, No. 653390/2012] [same].) 
These cases have required extensive CPLR art. 31 disclosure before ultimate resolution. The failure to notify claims here will also require article 31 disclosure that will not differ materially from the disclosure in the breach of representations and warranties cases. The difficulties in determining the viability of the claims at the outset of the actions thus exist in both categories of cases. It also cannot be ignored that these difficulties arise because the extremely sophisticated parties to the agreements governing RMBS securitizations themselves typically agreed to condition the various parties' obligations under those agreements on their discovery of breaches of representations and warranties. 
Perhaps more important, the impact of an independently enforceable notification obligation, and of a discovery based accrual rule for breach of this obligation, is not nearly so far-reaching as the Trustee contends. The court agrees that an independent cause of action for breach of the notification obligation appears to open a "backdoor" to ACE. (See Bank of NY Mellon, 53 Misc 3d 967, 981 n 12 [Sup Ct, NY County, Sept. 7, 2016, No. 653099/2014, Kornreich, J.].) Contrary to the Trustee's contention, however, the Trustee will not be entitled, under the guise of a failure to notify claim, to recover for every breach of representations and warranties that the defendant securitizer has discovered or will discover over the life of the Securitizations. Rather, as discussed below, the Trustee's claims will be timely if based on breaches that the defendant discovered within the six-year period immediately preceding the assertion of the failure to notify causes of action. Claims based on defendants' discovery of breaches prior to this six-year period will not be timely. As also discussed below, the damages for the timely claims will be subject to limitations. Thus, damages equivalent to those under the repurchase remedy (repurchase damages) will not be available even for timely brought failure to notify claims, unless they are based on breaches discovered during the six-year period following the date of the closing, while the repurchase remedy remained available to the Trustee. The record on these motions is not sufficiently developed as to whether damages other than repurchase damages may be available for these failure to notify claims. If repurchase damages are not recoverable, however, the claims may be maintained at least for nominal damages.
C. Claims Based on Discovery of Breaches More than Six Years Before the Assertion of the Failure to Notify Causes of Action—the Continuing Obligation Doctrine
The court rejects the Trustee's contention that, pursuant to the "continuing obligation doctrine," its claims are timely even to the extent that they are based on MSAC's discovery of breaches before the closing dates of the Securitizations and therefore more than six years before the assertion of the failure to notify causes of action. The Trustee argues that "[r]egardless of when Morgan Stanley initially breached [the duty to notify], it continued to breach that duty by failing to provide notice at any time thereafter." (Tee.'s Opening Memo., at 20 [emphasis in [*12]original].) The Trustee contends that, "[u]nder the continuing obligation doctrine, [it] may assert claims for those persistent failures to notify, regardless of when Morgan Stanley initially discovered the breaches." (Id., at 21.)
Acceptance of this theory would eviscerate the statute of limitations for failure to notify claims. A trustee could bring a claim thirty years in the future on the ground that a securitizer, decades earlier, discovered breaches of representations and warranties and failed to provide notice, thereby causing or contributing to the trustee's failure to commence a put-back action within the statute of limitations period. In arguing for this untenable result, the Trustee misconstrues the continuing obligation doctrine. That doctrine "will save all claims for recovery of damages but only to the extent of wrongs committed within the applicable statute of limitations." (Henry v Bank of Am., 147 AD3d 599, 601 [1st Dept 2017].) "The doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct. The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." (Id. [internal quotation marks and citations omitted].) Put another way, "[i]f . . . a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." (Guilbert v Gardner, 480 F3d 140, 150 [2d Cir 2007] [applying New York law].) 
As the Court of Appeals has explained, where a contract provides for a continuing obligation, the statute of limitations "run[s] separately for the damages occasioned each time a breach of the obligation . . . occur[s]." (Bulova, 46 NY2d at 611.) The doctrine does not revive the statute of limitations for any breach of the continuing obligation that occurred more than six years before the action was commenced. Claims for breaches of the obligation will therefore only be timely if the breaches occurred within the six years immediately preceding such commencement. (Id., at 612.)
Here, the obligation of MSAC to give "prompt written notice" upon its discovery of a breach of representations and warranties continued after the closings of the Securitizations and was a continuing obligation under the governing agreements. (See PSAs, quoted supra, at 6-7 n 8.) On the above authority, the Trustee's claim for a breach of the notification obligation will be timely only if MSAC's discovery occurred within the six-year period before the assertion of the failure to notify causes of action. 
The court accordingly turns to the issue of whether the Trustee's amended complaint in FHFA (NC1) and the proposed amended complaint in FHFA (NC3) plead timely claims. 
D. Sufficiency of the Pleading of Timely Claims
Defendants in effect contend that the pleadings do not allege facts showing that MSAC discovered material breaches of representations and warranties within the six-year period preceding the assertion of the failure to notify causes of action. Rather, according to defendants, the pleadings do not state timely failure to notify claims because they allege only that MSAC was aware of pervasive defects in the loan pool as a result of its due diligence prior to the closing [*13]dates—more than six years before the complaints were filed. (Defs.' Opening Memo., at 3-4.)[FN13]
The Trustee argues in opposition that its pleadings allege "specific facts indicating that at least some of the breaches were discovered only after the securitization[s] closed." (Tee.'s Opening Memo., at 5.) 
In FHFA (NC1), the amended complaint pleads that "MSAC or its affiliates were responsible for selecting the loans to be securitized, and had access to information about the loan underwriting process as a result of due diligence and repeated dealings with NC Capital, from which the Mortgage Loans were acquired" (NC1 Am. Compl., ¶ 61); that "it is customary in the industry for the sponsor of an RMBS securitization [here, MSMC] or its affiliates to conduct due diligence on the mortgage loans it selects, either through its own staff or through a third party"; and that "[o]n information and belief, MSAC or its affiliates conducted such due diligence here, acquiring further detailed information about the characteristics of the Mortgage Loans and the underwriting process." (Id., ¶ 62.) The amended complaint also alleges that MSAC acquired knowledge of breaches of representations and warranties from the complaint in a federal securities fraud action filed in 2011 by FHFA against Morgan Stanley. (NC1 Am. Compl., ¶ 65.) The types of alleged breaches of representations and warranties are identified in the amended complaint, and include representations about borrower income, debt-to-income ratios, and borrower employment status. (Id., ¶¶ 44-48.) In addition, the amended complaint pleads that "[t]he breaches of representations and warranties [were] so pervasive throughout the loan pool, and their nature [wa]s so severe and unmistakable, that they should have been apparent to any party with MSAC's level of involvement and knowledge." (Id., ¶ 64.)
The proposed amended complaint in FHFA (NC3), first filed in connection with these motions, pleads similar allegations regarding the existence of pervasive breaches of identified representations and warranties, including those regarding loan-to-value ratios, owner occupancy, and mortgage delinquencies. (NC3 Proposed Am. Compl., ¶¶ 39-40.) This complaint, like the FHFA (NC1) amended complaint, pleads that it is "customary in the industry for the sponsor of an RMBS securitization to conduct due diligence on the mortgage loans it selects, either through its own staff or through a third party" (id., ¶ 18), and that MSAC acquired knowledge of breaches as a result of the due diligence. (Id., ¶ 79.) Unlike the FHFA (NC1) complaint, the FHFA (NC3) complaint specifies when due diligence occurs, pleading that, "[c]ustomarily, those reviews occur both prior to and after securitization, in connection with, among other things, monitoring of mortgage loan performance, repurchase requests made to originators, and repurchase requests received from parties to the securitization." (NC3 Proposed Am. Compl., ¶ 18.) The FHFA (NC3) complaint also pleads that MSAC, as Depositor and affiliate of MSMC, the Sponsor, had "extensive knowledge" of the due diligence results. (See id., ¶¶ 12, 19.)
As held above, under the terms of the PSAs, the notification obligation is a continuing obligation that survives the closing date. In imposing the continuing obligation on MSAC, the [*14]PSAs reflect the parties' expectation that MSAC might be in a position after the closing to discover breaches of representations and warranties. Given that the representations and warranties did not become effective until the moment of closing, a notification obligation that was limited to MSAC's knowledge of breaches at the time of closing would be of little utility to the Trustee or other parties. Moreover, neither complaint pleads, nor supports the inference, that MSAC discovered all of the breaches of representations and warranties prior to the closing date.[FN14]

The court concludes that, under New York's liberal pleading standards (see CPLR 3013), the amended complaint in FHFA (NC1) pleads a timely failure to notify cause of action. The question of whether MSAC discovered breaches of representations and warranties post-securitization is likely a matter peculiarly within MSAC's knowledge, and is not properly determined on a motion to dismiss. The amended complaint alleges the pervasiveness of defects in the loan pools, defendants' performance of due diligence, and their consequent knowledge of breaches of representations and warranties. Although the complaint pleads that "many" breaches were apparent at the time of the securitization (NC1 Am. Compl., ¶ 64), it does not plead facts from which it can be inferred that MSAC did not subsequently discover any breaches. Considering the purpose of the notification obligation, and giving the Trustee the benefit of all [*15]favorable inferences, as the court must do on a motion to dismiss (see 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002]), the court holds that the allegations of the amended complaint support the inference that MSAC discovered breaches of representations and warranties not only at or before the securitization closed, but also within the six-year period prior to the assertion of the failure to notify claims. 
It is noted, moreover, that it is defendants' initial burden on a motion to dismiss to make a prima facie showing that the complaint is barred by the statute of limitations. (See Lebedev v Blavatnik, 144 AD3d 24, 28 [1st Dept 2016].) Yet, defendants do not deny that MSMC performed both pre- and post-securitization due diligence and that the results were shared between MSMC and MSAC as affiliates. Nor do they otherwise make any showing that MSAC discovered all breaches of representations and warranties as of the closing date.
The court similarly holds that the FHFA (NC3) proposed amended complaint pleads a timely failure to notify cause of action. A motion for leave to amend should be granted unless the proposed amended complaint is palpably insufficient or plainly lacking in merit. (See e.g. MBIA Ins. Corp. v Greystone & Co., Inc., 74 AD3d 499, 500 [1st Dept 2010]; Miller v Cohen, 93 AD3d 424, 425 [1st Dept 2012].) The proposed amended complaint alleges pervasive breaches in the loan pools and the customary performance in the industry of both pre- and post-securitization due diligence, resulting in MSAC's knowledge of breaches of representations and warranties. As stated above, MSAC's discovery of breaches is likely a matter peculiarly within MSAC's knowledge. The overwhelming weight of authority thus holds that, at the pleading stage loan-level breaches are not required to be identified in order to state a claim, where RMBS claims are based on a defendant's discovery. (See cases cited supra, at 24.) Under these circumstances, the court rejects defendants' contention that any further showing of the merit or timeliness of the proposed failure to notify claim is required.[FN15]

E. The Sufficiency of the Pleading of Causation and Damages
As discussed above, the Trustee represents on these motions that the principal damages it seeks on the failure to notify causes of action are damages for its alleged inability to exercise its repurchase remedy, as a result of defendant MSAC's breach of its obligation to notify the Trustee of MSAC's discovery of breaches of representations and warranties. Under the typical RMBS governing agreement, the repurchase remedy is the sole remedy for a cause of action brought by a trustee for breaches of representations and warranties. As a failure to notify claim cannot be permitted to serve as a means to avoid or extend the statute of limitations on a breach of representations and warranties cause of action, a question arises as to whether the repurchase damages that the Trustee seeks are also recoverable on a failure to notify cause of action. The [*16]court accordingly considers whether the complaints plead facts which support an inference that repurchase damages were proximately caused by MSAC's failure to notify.[FN16]

In order to prove a breach of contract cause of action, the plaintiff must prove that a defendant's breach was the proximate cause of its damages. (Fruition, Inc. v Rhoda Lee, Inc., 1 AD3d 124, 125 [1st Dept 2003]; Weiner v Hershman & Leicher, P.C., 248 AD2d 193, 193 [1st Dept 1998].) "The damages for which a party may recover for a breach of contract are such as ordinarily and naturally flow from the non-performance.'" (Fruition, Inc., 1 AD3d at 125, quoting Booth v Spuyten Duyvil Rolling Mill Co., 60 NY 487, 492 [1875].) "In the law of contracts, as in torts, causation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage." (Coastal Power Intl., Ltd. v Transcontinental Capital Corp., 10 F Supp 2d 345, 366 [SD NY 1998] [applying New York law] [internal quotation marks and citations omitted], affd for substantially the reasons stated 182 F3d 163 [1999]; 28A NY Prac., Contract Law, § 22:7 [same].) This "test is satisfied if the defendant's actions would be thought of by people generally as having operated to an important extent in producing the harmful result." (Coastal, 10 F Supp 2d at 366 [internal quotation marks and citation omitted].) It is not necessary that the breaches be "the exclusive cause" or the "sole cause" of the damages. (Id. [internal quotation marks and citation omitted, emphasis in original].) Damages must nevertheless "be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." (Kenford Co., Inc. v County of Erie, 67 NY2d 257, 261 [1986].) "To break the legal chain, the intervening act must have been of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." (NAF Holdings, LLC v Li & Fung [Trading] Ltd., 2016 WL 3098842, * 6 [SD NY, June 1, 2016, No. 10 Civ 5762] [applying New York law] [internal quotation marks and citations omitted].) 
At the pleading stage, however, it is not necessary for the plaintiff to plead the precise measure of damages. The complaint need only allege facts from which damages may reasonably be inferred. (See e.g. Harmit Realties LLC v 835 Ave. of the Ams., 128 AD3d 460, 461 [1st Dept 2015]; CAE Indus. Ltd. v KPMG Peat Marwick, 193 AD2d 470, 472-473 [1st Dept 1993]; 36 NY Jur 2d Damages § 207.)
The Trustee contends that, "[i]f a sponsor, depositor, originator, or servicer discovers a breach at some point within the first six years of the securitization, but fails to provide prompt notice to the Trustee so that the Trustee can make a timely repurchase demand, the Trustee's lost repurchase remedy is a direct result of the failure to notify." (Tee.'s Suppl. Memo., at 2.) The Trustee further argues that "not only is an inability to make a timely repurchase demand a natural and probable consequence of a failure to notify — it is one of the precise forms of injury the duty to notify is designed to prevent." (Id.) Defendants dispute that MSAC's failure to notify the Trustee of defective loans was a proximate cause of the Trustee's failure to file a timely action for breach of representations and warranties. They argue that "any purported [*17]damages resulting from the Trustee's failure to file timely suit were proximately caused by the Trustee's failure to sue when FHFA attempted to do so on its behalf—and to instead sue at FHFA's direction six months later . . . ," after the statute of limitations for the breach of representations and warranties claim had passed. (Defs.' Suppl. Memo., at 2.) According to defendants, this failure to file suit was "the intervening cause." (Id., at 4.)
It is apparent from the plain terms of the PSAs that the duty to notify serves primarily to facilitate the Trustee's pursuit of the repurchase remedy for breaches of representations and warranties. The function of the notification obligation as a facilitator of the repurchase remedy is apparent from the inclusion of the obligation in the same sections of the PSAs as those which set forth or provide for enforcement of that remedy. (See PSA provisions, quoted supra at 6-7, n 7-8.) Moreover, as is customary in RMBS governing documents, both PSAs here impose certain limits on the Trustee's investigative duties, particularly before the occurrence of a contractually-defined Event of Default. (See NC1 PSA, §§ 8.01, 8.02 [d]; NC3 PSA, §§ 8.01, 8.02 [d].)[FN17]
MSAC's promise to notify the Trustee of breaches can be perceived as partially filling that gap, providing at least some assurance to the Trustee and certificateholders that, if breaches exist that materially affect their interests in the loans, the Trustee will be made aware of such breaches so that it can pursue its contractual remedy on behalf of certificateholders.
As held above, the amended complaint in FHFA (NC1) and the proposed amended complaint in FHFA (NC3) plead timely failure to notify claims based on MSAC's discovery of breaches of representations and warranties within the six-year periods preceding the assertion of the failure to notify claims. These six-year periods substantially overlap with the periods in which the repurchase remedy was still available to the Trustee. The court finds that the complaints, considered in light of the purpose of notification obligation, plead facts sufficient to support the inference that defendant MSAC's breach of its notification obligation, during the period in which the repurchase remedy was still available, was a "substantial factor" in the Trustee's failure to bring timely claims for breaches of representations and warranties. The court reaches a different result to the extent that the Trustee seeks to recover repurchase damages for MSAC's failure to notify it of breaches discovered more than six years after the closing dates of the Securitizations. The Trustee's sole remedy for breaches of representations and warranties expired with the statute of limitations applicable to such breaches, on the six-year anniversary of the closing dates. MSAC's discovery of breaches and failure to notify after that time obviously cannot have had any causal effect on the Trustee's ability to seek the repurchase of such loans. 
In upholding the pleading of the complaints as to repurchase damages, the court does not suggest that the Trustee's claims for these damages will ultimately be successful. A legitimate question is raised as to whether, and to what extent, the Trustee and the certificateholders are [*18]themselves responsible for their failure to commence timely put-back litigation. It is undisputed that the repurchase remedy was available to the Trustee for six years following the closing dates of the Securitizations. In each case, this six-year period passed years after the financial crisis of 2008 and the publication of numerous reports of widespread misconduct in the securitization of residential mortgages. Many trusts were able to bring timely claims for breach of representations and warranties against securitizers, notwithstanding those securitizers' alleged failure to notify the trustees of defective loans. 
As defendants point out, even in the instant cases, a certificateholder of the Trusts, acting through FHFA, did initiate timely repurchase litigation against these defendants, although it lacked standing to do so. (See FHFA [NC1], 2016 WL 1587345, at * 3 [holding that FHFA's summons with notice on behalf of Freddie Mac was timely, albeit defective]; see also U.S. Bank Natl. Assn. v DLJ Mtge. Capital, Inc., 141 AD3d 431, 432-433 [1st Dept 2016], lv granted 29 NY3d 910 [2017].) Notably, the governing documents in RMBS securitizations ordinarily contain provisions that enable the certificateholders—the ultimate beneficiaries of put-back litigation—to direct the Trustees to investigate facts or to commence litigation against securitizers, and/or to commence such litigation themselves on behalf of their trusts, upon compliance with specified conditions. (NC1 PSA, §§ 8.02 [d], [i], 10.08.) 
In considering RMBS fraud claims brought by certificateholders, this court has repeatedly held that as early as 2009, four years before the limitations periods lapsed in these actions, certificateholders were put on inquiry notice as to alleged fraudulent misrepresentations regarding the quality and characteristics of the mortgage loans underlying their securitizations. These decisions cited extensive publicly available evidence, including media reports, a 2011 report of the Financial Crisis Inquiry Commission, widespread filing of lawsuits asserting similar claims against various securitizers and major originators, and downgrades of the certificates. (See e.g. Commerzbank AG London Branch v UBS AG, 2015 WL 3857321, * 2 [Sup Ct, NY County, June 17, 2015, No. 654464/2013]; IKB Intl. S.A. v Morgan Stanley, 2014 WL 5471650, * 4 [Sup Ct, NY County, Oct. 28, 2014, No. 653964/2012], affd on other grounds 142 AD3d 447 [1st Dept 2016]; see also HSH Nordbank AG v Barclays Bank PLC, 2014 WL 841289, * 7-8 [Sup Ct, NY County, Mar. 3, 2014, No. 652678/2011] [collecting authorities].)[FN18]

A serious issue thus exists as to whether the Trustee's own inaction, the certificateholder's failure to properly commence these actions, or the certificateholder's failure, if any, to direct the Trustee to commence the actions within the statute of limitations, were contributing or even intervening causes of the Trustee's damages. The court, however, makes no findings in this regard, as causation must ultimately be determined by the fact finder upon a fully developed record. (NAF Holdings, LLC, 2016 WL 3098842, at * 6 ["In contract as in tort cases, questions of proximate cause, including intervening cause, should generally be resolved by the factfinder" (internal quotation marks and citations omitted)].) 
As the court holds that the Trustee may maintain claims for repurchase damages subject to the limitations set forth in this decision, the court does not address the viability of the measures of damages, other than repurchase damages, proposed by the Trustee. The court notes, however, that the Trustee does not adequately explain its claim that MSAC's failure to notify impaired the servicers' ability to address loan defects. (See Tee.'s Suppl. Memo., at 4.) In addition, the Trustee's claim that rescissory or consequential damages "may be appropriate" (id., at 6) is not developed on this record and, although questionable, therefore cannot be appropriately addressed. Finally, whether or not the Trustee is entitled to repurchase damages or other damages, the Trustee may maintain its failure to notify claims for nominal damages, as "[n]ominal damages are always available in breach of contract actions." (Kronos, Inc. v AVX Corp., 81 NY2d 90, 95 [1993]; see also Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 143 [2017]; Ross v Sherman, 95 AD3d 1100, 1100 [2d Dept 2012] [holding that trial court "properly awarded the plaintiffs only nominal damages on their cause of action alleging breach of contract," where "plaintiffs failed to submit sufficient evidence to demonstrate actual damages . . . ."].) 
In light of this holding that the amended complaint in FHFA (NC1) and the proposed amended complaint in FHFA (NC3) adequately plead facts from which damages can be inferred, the court need not consider the proposed amended complaints submitted with the Trustee's supplemental papers on these motions.
CONCLUSION
For all of the above reasons, the court holds that the amended complaint in FHFA (NC1), and the proposed amended complaint in FHFA (NC3) state timely failure to notify claims against defendant MSAC. 
It is accordingly hereby
ORDERED that the renewed motion of defendant Morgan Stanley ABS Capital I Inc. in Federal Housing Finance Agency v Morgan Stanley ABS Capital I Inc. (Index No. 650291/2013) (FHFA [NC1]) to dismiss the second cause of action (for "Breach of Contract—Failure to Notify") is denied; and it is further
ORDERED that the motion of Deutsche Bank National Trust Company (the Trustee) to amend the complaint in Federal Housing Finance Agency v Morgan Stanley Mortgage Capital Holdings LLC (Index No. 651959/2013) (FHFA [NC3]) is granted to the extent that the Trustee is granted leave to serve and file the proposed amended complaint attached as exhibit 5 to the Weinstein Affidavit in Support of defendants' motion. Provided that: To the extent that the amended complaint repleads causes of action dismissed by this court's decision dated April 12, 2016, those causes of action are deemed dismissed; and it is further
ORDERED that the proposed amended complaint in FHFA (NC3) shall be deemed served upon service of a copy of this order with notice of entry.
This constitutes the decision and order of the court.
Dated: New York, New York
March 6, 2018
___________________________
MARCY FRIEDMAN, J.S.C.



Footnotes

Footnote 1:As used in this decision, the word securitizer means sponsor or depositor. The RMBS securitization process is summarized by the Court of Appeals in ACE Securities Corp. v DB Structured Products, Inc. (25 NY3d 581, 589 [2015]). The securitization process and the roles of securitization participants are also discussed in this court's prior RMBS decisions, and will not be repeated here. (See e.g. HSH Nordbank AG v Barclays Bank PLC, 2014 WL 841289, * 1-2 [Sup Ct, NY County, Mar. 3, 2014, No. 652678/11].)

Footnote 2:Deutsche Bank National Trust Company is the Trustee of both Trusts. The Trustee states in its papers on this motion that "Deutsche Bank National Trust Company as Trustee for the MSAC 2007-NC1 Trust and Deutsche Bank National Trust Company as Trustee for the MSAC 2007-NC3 Trust are legally distinct entities." (Tee.'s Opening Memo., at 1 n 1.) For purposes of convenience, this decision will refer to both entities as the Trustee.

Footnote 3:The Prior Decisions were based upon the Court of Appeals and First Department decisions in ACE Secs. Corp. v DB Structured Prods., Inc. (25 NY3d 581 [2015], affg 112 AD3d 522 [1st Dept 2013] [ACE]), discussed in greater detail below. With respect to the Trustee's breach of representation and warranty claims, the court held that FHFA, the entity—a certificateholder's conservator—that had initially filed the summonses with notice on behalf of the Trusts, had not complied with the no-action clauses in the governing agreements before bringing suit, and therefore lacked standing to commence either action. (FHFA [NC1], 2016 WL 1587345, at * 4.) The court further held that the Trustee's pleadings, filed more than six-years after the closing dates of the Securitizations, did not relate back to FHFA's summonses with notice, and were therefore untimely to the extent that they alleged breaches of representations and warranties. (Id.) With respect to the Trustee's claims for failure to repurchase, the court reasoned that, under the Court of Appeals decision in ACE, there can be no separate cause of action for a securitizer's failure to repurchase loans affected by breaches of representations and warranties. (Id., at * 10.)

Footnote 4:By Order of the Administrative Judge, dated May 23, 2013, this court was designated to hear "all actions hereafter brought in this court alleging misrepresentation or other wrong in connection with or arising out of the creation or sale of residential mortgage-backed securities." The RMBS breach of contract or "put-back" actions have been proceeding on a coordinated basis in this Part.

Footnote 5:See e.g. Federal Hous. Fin. Agency v Novation Companies, Inc., 2017 WL 6025527 (Sup Ct, NY County, Nov. 30, 2017, No. 650693/2013); Federal Hous. Fin. Agency v Federal Hous. Fin. Agency v HSBC Fin. Corp., 2017 WL 1479480 (Sup Ct, NY County, Apr. 25, 2017, No. 651627/2013); Federal Hous. Fin. Agency v UBS Real Estate Secs., Inc., 2016 WL 4039321 (Sup Ct, NY County, July 27, 2016, No. 651282/2012); Federal Hous. Fin. Agency v EquiFirst Corp., 2016 WL 3906070 (Sup Ct, NY County, July 19, 2016, No. 650692/2013).

Footnote 6:As used herein, "Tee.'s Opening Memo." refers to the Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the MSAC 2007-NC1 Complaint and in Support of the Trustee's Cross-Motion to Amend the MSAC 2007-NC3 Complaint. "Defs.' Opening Memo." refers to the Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss Plaintiff's MSAC 2007-NC1 Amended Complaint and Opposition to Plaintiff's Motion to Amend its MSAC 2007-NC3 Complaint.

Footnote 7:Section 2.03 (f) of the NC1 PSA provides, in pertinent part: 
"Within 90 days of the earlier of either discovery by or notice to the Depositor [MSAC] of any breach of a representation or warranty set forth on Schedule III hereto that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Depositor shall use its best efforts to promptly cure such breach in all material respects and, if such defect or breach cannot be remedied, the Depositor shall purchase such Mortgage Loan at the Repurchase Price or, if permitted hereunder, substitute a Substituted Mortgage Loan for such Mortgage Loan." Section 2.03 (m) further provides that "[i]t is understood and agreed by the parties hereto that the obligation of the Depositor or the Responsible Party [non-party NC Capital Corporation] under this Agreement to cure, repurchase or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing, together with any related indemnification obligations set forth herein, shall constitute the sole remedies against such Persons respecting such breach available to Certificateholders, the Depositor (if applicable), or the Trustee on their behalf."
Section 4 (a) of the NC3 RWA provides, in pertinent part: "Within sixty (60) days of the earlier of either discovery by or notice to the Sponsor [MSMC] of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein . . . , the Sponsor shall cure such breach in all material respects and, if such breach cannot be cured, the Sponsor shall, at the Depositor's option, within sixty (60) calendar days of the Sponsor's receipt of request from the Depositor, repurchase such Mortgage Loan at the Repurchase Price." Substitution of loans is also permitted for certain breaches. (Id.) Section 4 (c) provides that "[i]t is understood and agreed that the obligation of the Sponsor set forth in Section 4(a) to repurchase for [sic] a Mortgage Loan in breach of a representation or warranty contained in Section 2 constitutes the sole remedy of the Depositor or any other person or entity with respect to such breach." Section 2.01 of the NC3 PSA conveys the Depositor's "right, title and interest" in the Trust Fund to the Trustee for the benefit of the certificateholders. The definition of the Trust Fund includes "the Depositor's rights under the Representations and Warranties Agreement."
Footnote 8:Section 2.03 (d) of the NC1 PSA provides, in pertinent part: 
"Upon discovery by any of the parties to this Agreement of a breach of any of the foregoing representations and warranties that materially and adversely affect the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the party discovering such breach shall give prompt written notice to the other parties." Section 2.07 of the NC3 PSA similarly provides, in pertinent part: "Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the Sponsor pursuant to the Representations and Warranties Agreement, the party discovering such breach shall give prompt written notice thereof to the other parties to this Agreement and the Sponsor." After providing for such notice, section 2.07 states that "[t]he Trustee shall pursue all legal remedies available to the Trustee with respect to such breach under the Representations and Warranties Agreement, as may be necessary or appropriate to enforce the rights of the Trust with respect thereto, if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies." 
Although these agreements imposed notification obligations upon MSAC, as a party to the PSAs, MSMC (the Sponsor) was not a party to the PSAs. The parties have not cited any contractual provision imposing an express contractual obligation upon MSMC to notify the Trustee of its discovery of breaches of representations and warranties.
Footnote 9:Based on its holding that the Trust failed to fulfill the condition precedent, the Court declined to address the issues of standing and relation back that were also disputed by the parties. (ACE, 25 NY3d at 599.)

Footnote 10:The plaintiff trustee in GreenPoint had not notified the defendant originator, prior to the commencement of the action, "that any of the loans it had originated were in breach of its representations and warranties; nor was any demand made for GreenPoint to cure or repurchase any of the mortgages." (Id., at 83.) Rather, "[t]he summons with notice refer[red] to a breach of contract claim solely predicated on defendant's knowing about the nonconforming mortgages at closing." (Id.) In considering the trustee's claim for breach of representations and warranties, the Court framed the issue as "whether a breach notice is required when the underlying contract claim is based upon a defendant's independent discovery or knowledge of the nonconforming mortgages." (Id., at 81.)

Footnote 11:This reading of the GreenPoint decision is not altered by the fact that the decision, in describing the background of the dispute, quoted allegations from the complaint that the defendant originator had "'breached its contractual obligations to provide notice to the Trustee of the breaches . . . ." (See GreenPoint, 147 AD3d at 84.) Although it appears from those quoted allegations that the trustee in GreenPoint pleaded a failure to notify claim, nothing in the decision indicates, and defendants do not argue on the instant motions, that the accrual of the failure to notify claim was at issue in that action, or that the GreenPoint trustee argued on appeal that its failure to notify claim accrued differently than its claims for breaches of representations and warranties.
As Nomura and Morgan Stanley address the viability of an independent failure to notify claim, and not the bases on which the separate breach of representations and warranties claim may be maintained, the GreenPoint Court's citation of Nomura and Morgan Stanley on the latter issue has perhaps led to confusion.
Footnote 12:As discussed above, the BNYM Court held that ACE did not bar the independent claim against the servicer "because [the servicer] [wa]s not subject to the repurchase protocol. . . ." (Id., at 81.) The trial court had dismissed the failure to notify claims against the servicer, sponsor, and originator. The Appellate Division decision discussed only the claim against the servicer, which it reinstated. In Nomura, the Appellate Division reinstated an independent failure to notify claim against a securitizer that it held was subject to the sole remedy clause for breaches of specific representations and warranties, but not for breaches of a so-called "no untrue statement" representation. (133 AD3d at 107-108.) (The Court of Appeals subsequently held that the sole remedy clause applied to both categories of breaches identified by the Appellate Division. [See Nomura, 2017 WL 6327110, at * 5].) In BNYM, the Appellate Division characterized its decisions in Morgan Stanley and Nomura as holding that "claims for failure to notify were not claims 'respecting a warranty breach' subject to the 'sole remedy' clause." (BNYM, 151 AD3d at 81.) In Nomura and Morgan Stanley, there were timely breach of representation and warranty claims. In BNYM, there were not. The parameters of the failure to notify claim have thus not yet been fully defined by the Appellate Division.

Footnote 13:The court notes that defendants challenge the complaints on the ground that all of the failure to notify claims accrued, at the latest, at the time of the closing date and were therefore untimely. They do not challenge the proposed amended complaint in FHFA (NC3) on the ground that MSAC was not a party to the original complaint, and do not claim that the failure to notify claims in the proposed amended complaint do not relate back to the original complaint.

Footnote 14:A critical issue, which is not addressed on these motions and remains to be decided in the RMBS litigation, is whether a defendant securitizer will be found to have "discovered" breaches of representations and warranties only when the defendant acquires actual knowledge of specific breaches or when the defendant should, with reasonable diligence, have discovered such breaches—i.e., when the defendant was put on inquiry notice of breaches. In a recent case brought by plaintiff holders of RMBS certificates against a trustee, the plaintiffs alleged that the trustee had violated the PSA by failing to give written notice of certain breaches of representations and warranties upon the trustee's own discovery of such breaches. The Appellate Division denied a motion to dismiss this claim, holding that "plaintiffs were not required to allege that defendant had actual knowledge of a loan-specific breach." (Fixed Income Shares: Series M v Citibank, N.A., 157 AD3d 541 [1st Dept 2018].) In support of this holding, the Court reasoned that the PSA provision which imposed the notification obligation on the trustee used the word "discovery," whereas the term "actual knowledge" was used in a separate provision of the PSA that imposed other duties on the trustee. (Id.) 

In the instant cases, defendants have not discussed the various contractual provisions imposing duties on the parties upon discovery or actual knowledge. Defendants do not argue that an inquiry notice standard applies to the failure to notify claims, and the Trustee does not argue that an actual notice standard applies. Determination of the discovery standard may be necessary upon the resolution of these cases, as the complaints arguably raise an inference that defendants were put on inquiry notice of extensive breaches very early in the securitization process—possibly more than six years before the complaints were filed. 


The Courts' ultimate determination as to when a party will be found to have discovered breaches could also have a significant impact on the viability and proof of the various claims asserted in the RMBS litigation generally. In determining the appropriate standard for "discovery," Courts will be called upon to consider not just the use of terms alternative to "discovery" elsewhere in the governing agreements, but also the substance of provisions setting forth the interrelated obligations of the parties. These include provisions imposing notification obligations upon various parties and provisions limiting the time period afforded a party after discovery of breaches (generally 60-90 days) to cure such breaches, or to substitute or repurchase affected loans. Courts will also be called upon to consider how these remedial obligations can be practically complied with if "discovery" is held to occur before the party gains actual knowledge of a specific breach. 

It is noteworthy that, under RMBS governing agreements, both trustees and securitizers generally have obligations upon discovery of breaches of representations and warranties, and so may be harmed or benefited by application of an actual knowledge or inquiry notice standard, depending on which party's obligation is at issue in a particular case.
Footnote 15:See Ambac Assur. Corp. v Nomura Credit & Capital, Inc., 2016 WL 7475831, * 3 n 4 (Sup Ct, NY County, Dec. 29, 2016, No. 651359/2013) (this court's prior decision surveying conflicting appellate authorities on the showing of merit required on a motion for leave to amend).

Footnote 16:Cognizant of the fact that these bellwether motions were briefed to resolve common issues in the RMBS litigation, and considering the importance of this issue, the court requested supplemental briefing on whether the complaint adequately alleges facts from which damages due to defendant's failure to notify may properly be inferred. (Oral Arg. Tr. at 39.) 

Footnote 17:The court makes no findings as to the scope of a trustee's duty to investigate—an issue that is the subject of extensive litigation, brought by certificateholders against RMBS Trustees, in both this and other Courts. (See e.g. Commerce Bank v Bank of NY Mellon, 141 AD3d 413 [1st Dept 2016]; IKB Intl., S.A. v LaSalle Bank N.A., Sup Ct, NY County, Index No. 654436/2015 and related cases pending in this Part; Phoenix Light SF Ltd. v Deutsche Bank Natl. Trust Co., 172 F Supp 3d 700 [SD NY 2016]; Royal Park Invs. SA/NV v Bank of NY Mellon, 2016 WL 899320 [SD NY, Mar. 2, 2016, No. 1:14-cv-6502, Woods, J.].)

Footnote 18:This court has also previously rejected arguments by trustees in put-back actions that defendant securitizers and originators were equitably estopped from asserting the statute of limitations due to the defendants' breach of their duties to notify the trustees upon their discovery of breaches. The court reasoned that the trustees failed to plead facts supporting their assertion that the defendants' failure to notify led the trustees to believe that there were no defective loans or prevented them from bringing suit within the limitations period. (See e.g. Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. Corp., 2015 WL 1646683, * 3-4 [Sup Ct, NY County, Apr. 13, 2015, No. 653048/2013] [this court's prior decision, citing additional authorities], affd on other grounds 143 AD3d 15, supra; Bank of NY Mellon v WMC Mtge., LLC, 53 Misc 3d 967, 971-973 [Sup Ct, NY County, Sept. 7, 2016, No. 653099/2014, Kornreich, J.] [rejecting equitable estoppel argument where the defendant was "not alleged to have hidden anything or prevented [the trustee] from discovering breaches"]; see also Wells Fargo Bank, N.A. v JPMorgan Chase Bank, N.A., 2014 WL 1259630, * 5 [SD NY, Mar. 27, 2014, No. 12 Civ 6168, Cedarbaum, J.], affd on other grounds 643 Fed Appx 44 [2d Cir, Mar. 16, 2016].)
These equitable estoppel cases are not determinative of the proximate causation issue in the instant actions. The doctrine of equitable estoppel is an extraordinary remedy that is applicable only where the plaintiff "was induced by fraud, misrepresentations, or deception to refrain from filing a timely action." (Ross v Louise Wise Servs., Inc., 8 NY3d 478, 491 [2007] [internal quotation marks and citation omitted]; Flagstar, 2015 WL 1646683, at * 3.) The standard of prevention for purposes of the equitable estoppel doctrine is more rigorous than the causation standard, under which there may be multiple causes of damages, so long as a party's conduct was a substantial factor in causing the damages.